## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| BRANDY McGINNIS | ) | |
| 14314 Bowsprit Lane, #32 | ) | |
| Laurel, Maryland 20707 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | Civil Action No. _____ |
| a Municipal Corporation, | ) | |
| 1350 Pennsylvania Ave., N.W. | ) | |
| Washington, D.C. 20004 | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| and | ) | |
| | ) | |
| LIEUTENANT ASHLEY ROSENTHAL, | ) | |
| in her individual capacity | ) | |
| 4610 Simpson Road | ) | |
| Temple Hills, Maryland 20748 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| INSPECTOR ALISA PETTY, | ) | |
| in her individual capacity | ) | |
| 11407 Vega Court | ) | |
| Upper Marlboro, Maryland 20774 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LIEUTENANT GREGORY STROUD, | ) | |
| in his individual capacity | ) | |
| 9350 Baker Street | ) | |
| Owings, Maryland 20736 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DIANA HAINES-WALTON, | ) | |
| in her individual capacity | ) | |
| 7710 Georgian Drive | ) | |
| Upper Marlboro, Maryland 20772 | ) | |
| | ) | |
| Defendants. | ) | |

_____

## COMPLAINT

Plaintiff Brandy McGinnis, by and through her undersigned counsel, hereby bring this Complaint against Defendant, the District of Columbia ("the District") and Defendants Lieutenant Ashley Rosenthal, Inspector Alisa Petty, and Diana Haines-Walton of the District of Columbia Metropolitan Police Department ("MPD") in their individual capacities ("the Individual Defendants") for:  (1) violation of 42 U.S.C. § 1983 by the Individual Defendants; (2) violation of 42 U.S.C. § 1983 by the District under the theory of liability articulated in *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978); (3) intentional infliction of emotional distress; and (4) defamation.

## INTRODUCTION

1.      Brandy McGinnis ("Ms. McGinnis") is a former recruit at the Metropolitan Police Academy (the "MPD Academy").

2.      Prior to becoming a recruit, Ms. McGinnis was a well-respected and decorated police officer at the Aventura Police Department ("APD") in Aventura, Florida.

3.      Prior to joining the APD, Ms. McGinnis underwent training at the Miami-Dade School of Justice ("APD Academy") where she suffered an unusually severe reaction to oleoresin capsicum ("OC" or "pepper") spray after being sprayed directly in the eyes.

4.      Ms. McGinnis was diagnosed with an allergy to OC spray and suffered permanent damage to her right eye which requires her to wear eyeglasses at night and while reading. Nevertheless, Ms. McGinnis graduated from the "APD Academy" and enjoyed a successful career at APD.

5.      Ms. McGinnis began her training at the MPD Academy on January 31, 2012, where she immediately excelled and was made Class Leader on the second day of training.

6.      Prior to her hiring and during her training as a recruit at the MPD Academy, Ms. McGinnis disclosed numerous times both in writing and verbally that she has an allergy to OC spray and had previously suffered an injury after being sprayed directly in the eyes.

7.      Nevertheless, after successfully enduring nearly six months of training, Ms. McGinnis was placed on "limited duty" due to her OC spray allergy several weeks before the recruits were to receive training on OC spray.

8.      While on limited duty, Ms. McGinnis was intentionally humiliated and embarrassed by the outrageous conduct of superior officers at MPD, including Individual Defendants Lieutenant Ashley Rosenthal, Inspector Alisa Petty, and Lieutenant Gregory Stroud. Their conduct directly and proximately caused Ms. McGinnis to suffer severe emotional distress in the form of anxiety and depression for which she is still seeking psychological treatment and counseling.

9.      On August 17, 2012, after nearly a month participating in training activities while still officially on limited duty, the District terminated Ms. McGinnis, allegedly for lying about her OC spray allergy.

10.     The District's pretext for terminating Ms. McGinnis was defamatory as she had disclosed the condition numerous times in front of numerous witnesses, both prior to and after her hiring by MPD.

11.     On information and belief, Defendants Rosenthal, Petty, and Stroud encouraged the District to terminate Ms. McGinnis based on this defamatory pretext.

12.     The District published its defamatory pretext for terminating Ms. McGinnis in a memorandum written by MPD Director of Human Resources, Diana Haines-Walton, and placed it in Ms. McGinnis's personnel file (the "Haines-Walton Memorandum").  The District's and

Ms. Haines-Walton's intentional publication of this defamatory statement was outrageous and directly and proximately caused Ms. McGinnis to suffer severe emotional distress in the form of anxiety and depression for which she was required to seek and continues to seek psychological treatment and counseling.

13.     The District allowed at least two other officers to read the Haines-Walton Memorandum, neither of whom were involved in the decision to terminate Ms. McGinnis and had no official business reading the memorandum.

14.     The District's defamatory pretext for terminating Ms. McGinnis has, on information and belief, been shared with additional officers at the MPD Academy who were not involved in the decision to terminate her and had no official business knowing the purported justification for her termination.

15.     Individual Defendants Rosenthal, Petty, Stroud, and Haines-Walton, in their individual capacities, acted willfully, knowingly, wrongfully, recklessly, and/or negligently in conspiring to terminate Ms. McGinnis based on a defamatory pretext; violated Ms. McGinnis's Fifth Amendment civil rights under the United States Constitution; and deprived Ms. McGinnis of her property interest in her job at MPD.

16.     As a direct and proximate result of the District's defamatory pretext for terminating her, Ms. McGinnis has been unable to find another job as a police officer despite her outstanding credentials, qualifications, and excellent record at APD.

17.     The District also violated Ms. McGinnis's Fifth Amendment civil rights under the United States Constitution under the theory or liability articulated in *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978), and deprived Ms. McGinnis of her property interest without due process.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1332(a) (diversity jurisdiction), 28 U.S.C. § 1343 (deprivation of civil rights), and 28 U.S.C. § 1367 (supplemental jurisdiction).  Venue is proper in this Court under 28 U.S.C. § 1391(b) because all of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## PARTIES

19.     At all relevant times, the District has been a municipal corporation with its principal place of business at 1350 Pennsylvania Avenue, N.W., in Washington, D.C. 2004.

20.     At all times relevant, Defendants Rosenthal, Petty, Stroud, and Haines-Walton were employed by MPD and were acting under the color of law and within the scope of their employment at MPD.

21.     Defendant Rosenthal is a Lieutenant with MPD and is a Maryland resident.

22.     Defendant Petty is an Inspector at the MPD Academy and is a Maryland resident.

23.     Defendant Stroud is an employee of MPD and is a Maryland resident.

24.     Defendant Haines-Walton is a District employee and is a Maryland resident.

25.     Throughout the course of her training at the MPD Academy and at the time of her termination, Ms. McGinnis[1] resided in the Commonwealth of Virginia.  She has since moved and now resides in Maryland.

## FACTS COMMON TO ALL CLAIMS

26.     Prior to becoming a recruit, Ms. McGinnis was a well-respected and decorated police officer in Aventura, Florida, who received several awards, promotions, and recognitions

[1] Ms. McGinnis recently married and has changed her last name, but for the sake of clarity is using the name she had during the time period addressed in this Complaint.

during her tenure with the APD.  Ms. McGinnis was made Squad Leader at the APD Academy, was named Officer of the Month in September 2010, and received Letters of Commendation from two other area agencies for her assistance with an arrest and a rescue.

27.     While at the APD Academy, Ms. McGinnis discovered that she has a medical condition involving a severe allergy to OC spray.

28.     During OC spray training at the APD Academy, Ms. McGinnis suffered an unusually harsh reaction to the spray.  After completing training for the day, Ms. McGinnis was still suffering from burning and swelling in one eye, and was ordered by her Captain to seek medical treatment.

29.     As a result of the incident, Ms. McGinnis suffered long-term vision impairment to one eye which requires her to wear eyeglasses at certain times.  Ms. McGinnis's condition has been characterized by her treating physicians as both an allergy and a hypersensitivity to OC spray.

30.     Ms. McGinnis's condition does not prevent her from carrying or even using OC spray, but her physicians have advised her to avoid a direct spray to the eyes.

31.     As she was at APD, Ms. McGinnis was similarly well-respected by her fellow recruits at the MPD Academy and was selected to be the Class Leader by her Class Sergeant.

32.     Despite being a well-respected Class Leader with a pristine record at MPD with no reprimands, no write-ups, and always at the top of her class, Ms. McGinnis fell out of favor with the officers who ran the MPD Academy sometime in late July or early August 2012.

33.     On August 17, 2012, Ms. McGinnis was terminated by the MPD for allegedly lying on her job application about a medical condition.  However, Ms. McGinnis never made a

single misrepresentation on her application or at any other time during her tenure at the MPD Academy.

34.     On the contrary, Ms. McGinnis was completely truthful and forthright both during the application process and during her time at the MPD Academy.  When Ms. McGinnis filled out her preliminary online "Bluebook" application for MPD on December 5, 2011, she disclosed the OC spray allergy, but noted that she is certified to use and carry OC spray.

35.     Despite this disclosure, MPD invited Ms. McGinnis to interview with a background investigator on December 14, 2011.  Ms. McGinnis told the investigator, Detective Mack-Burton, about her OC spray allergy in case it had been overlooked in her application. Detective Mack-Burton indicated that this would not be a problem.

36.     During Ms. McGinnis's MPD physical examination on January 17, 2012, she was required to fill out additional forms, including a medical history form that inquired about drug and sinus allergies, but not food or other types of allergies.  Ms. McGinnis checked the "yes" box for eye injury and, in the space provided on the medical history form to explain any "yes" answers, Ms. McGinnis disclosed that she suffered an eye injury from OC spray in 2007 which requires her to wear glasses at night or when reading to correct vision in her right eye.

37.     Ms. McGinnis also told the physician conducting the examination, Dr. Rosenthal, that she had an allergy to OC spray, that she disclosed it in her Bluebook application and to the background investigator, that there was no specific place for her to make the OC spray allergy disclosure on the medical history form, but that she disclosed the eye injury she suffered at the APD academy in 2007.  Again, Ms. McGinnis was told this would not be a problem since she disclosed the allergy to Detective Mack-Burton and was already certified.  Nevertheless, Dr. Rosenthal said that he would make a note of it in Ms. McGinnis's file.

38.     MPD hired Ms. McGinnis on January 25, 2012, and told that her start date would be January 31, 2012.

39.     On February 1, 2012, Sergeant David Young promoted Ms. McGinnis to the position of Class Leader.  As Class Leader, Ms. McGinnis reported directly to the Class Officer and was in charge of the other 28 recruits.

40.     Following her admission to the MPD Academy, Ms. McGinnis referenced the OC spray allergy numerous times in front of superior officers as well as her fellow recruits—and at least once in front of the entire class.

41.     On February 6, 2012, another recruit mentioned OC spray training in class.  At that time, Ms. McGinnis advised Sgt. Young and Class Officer Kelwin Ford, in front of the entire class of 28 recruits, that she was allergic to OC spray.  Ms. McGinnis did this in case the other officers might be unaware of her allergy.  Ms. McGinnis noted that she made the disclosure in her Bluebook application and had notified her background investigator.  Class Officer Ford then asked or stated:  "Isn't everyone allergic to OC?"  Ms. McGinnis explained that, although everyone suffers irritation from OC spray, people with an allergy suffer much more significant and longer-lasting effects following a direct spray to the eyes.  Sgt. Young advised that they would deal with the issue when the time came for OC spray training at the end of the Academy.

42.     From February through July 2012, Ms. McGinnis remained Class Leader.  She spent a great deal of time preparing study guides for her class to ensure that everyone passed written exams.  Ms. McGinnis's class had the distinction of being the first in MPD Academy history not to lose a recruit due to academic failures.

43.     In May 2012, after the class completed physical training and was preparing to start defensive tactics, Ms. McGinnis again advised Sgt. Young about her OC spray allergy.

44.     In June 2012, Ms. McGinnis once again reminded Sgt. Young about the allergy. At this time, Sgt. Young told Ms. McGinnis to get something in writing.

45.     On July 17, 2012, Ms. McGinnis provided to Sgt. Young a letter from Major William Washa of the Aventura Police Department, who had witnessed first-hand what happened to Ms. McGinnis when she took a direct OC spray to the eyes.  Sgt. Young stated that he would provide the letter to Lieutenant Ashley Rosenthal, a certified OC instructor, and advised that it should not be a problem.  Ms. McGinnis also obtained her medical records from her prior injury, but no one from the MPD Academy ever asked to see them.

46.     After making all of these disclosures—in the Bluebook, the medical history form, and to the physician conducting her physical examination—Ms. McGinnis was not expecting any trouble when her MPD Academy class was preparing for OC spray certification training.

47.     Ms. McGinnis was especially unconcerned because, according to the other MPD officers who were certified to conduct the OC spray training at the MPD Academy (Officer Jeffrey Boyd and Sergeant Kimberly Butler), they had been trained to spray recruits across the forehead rather than directly in the eyes.

48.     Lt. Rosenthal was also trained to spray recruits across the forehead rather than directly in the eyes, but she evidently believes this method is not effective enough and chooses to spray recruits across the eyes, anyway.

49.     On July 20, 2012, Ms. McGinnis learned from Class Officer Tanisha Thomas and Lt. Rosenthal that she needed to go to the clinic and that they would try to exempt her from OC spray training.  Ms. McGinnis responded that this was unnecessary; that she was not asking to be exempt, she was just requesting that she not be sprayed directly in the eyes.

50.     Nevertheless, Lt. Rosenthal advised that Ms. McGinnis had an appointment with Dr. Roxana Diba.  Ms. McGinnis explained to Dr. Diba that she was not trying to be exempted from the OC spray training, but merely sought to avoid being sprayed directly in the eyes by Lt. Rosenthal.  Nevertheless, Dr. Diba placed Ms. McGinnis on limited duty and advised that Ms. McGinnis would need to see an allergy specialist.

51.     On her way out of the MPD Academy on July 20, 2012, Ms. McGinnis ran into Class Officer Thomas and explained that she was being placed on limited duty until she sees an allergy specialist, but that she could still do everything except be exposed to OC spray.  Class Officer Thomas stated that she thought the decision to place Ms. McGinnis on limited duty was "bullshit," but that she would give Ms. McGinnis's paperwork from the clinic to Lt. Rosenthal.

52.     Later that evening, Ms. McGinnis found an allergy specialist and made an appointment for July 23, 2012.  These expenses were borne directly by Ms. McGinnis.

53.     The morning of July 23, 2012, Ms. McGinnis came to work in her uniform and led the morning formation as Class Leader.  After the morning formation, Class Officer Thomas and Officer Andrew Horos pulled Ms. McGinnis out of class and told her to remove her uniform and put on civilian attire because she was on limited duty.  Furthermore, Ms. McGinnis was required to turn over her responsibilities as Class Leader to the Assistant Class Leader.

54.     Ms. McGinnis was humiliated and embarrassed by this because a recruit is only required to wear civilian attire when he or she is injured, which Ms. McGinnis clearly was not, or if he or she is under investigation.  Ms. McGinnis's classmates and other recruits not in her class immediately began asking her what she had done wrong to be required to wear civilian clothing.

55.     After work on July 23, 2012, Ms. McGinnis went to see the allergy specialist, Dr. Ifeyinwa Okocha.  After explaining her symptoms and her experience at APD in 2007 to Dr.

Okocha, the doctor stated that it sounded as though Ms. McGinnis had an allergy to OC spray and that she would provide a letter to that effect.

56.     Dr. Okocha sent the letter to MPD via facsimile on July 27, 2012.  Lt. Rosenthal received the letter that day, brought it to Ms. McGinnis while she was in class, and advised her to again see Dr. Diba at the MPD clinic.  Because she was in mandatory training that day, Dr. Diba advised Ms. McGinnis to come in for "sick call" on Monday morning, July 30, 2012, to see Dr. Olusola Maloma.

57.     Ms. McGinnis saw Dr. Maloma on July 30, 2012, and was advised that she could not be exempted from the OC spray training.  Ms. McGinnis again explained that she was not trying to be exempted, only to be sprayed on the forehead as the instructors were trained rather than directly in the eyes.  Dr. Maloma then left the room to call the Medical Services Director, Lieutenant Gregory Stroud.  After approximately 15 minutes, Dr. Maloma returned and advised Ms. McGinnis that she was still on limited duty and to return to the clinic on August 16, 2012, to see Dr. Diba.  When Ms. McGinnis asked why she needed to return to the clinic on August 16, Dr. Maloma offered no explanation.

58.     When she left the clinic, Ms. McGinnis called Class Officer Thomas to update her.  Officer Thomas again stated that it was "bullshit" and that the two should speak the following morning.

59.     Ms. McGinnis spoke with Class Officer Thomas again the morning of July 31, 2012, and Officer Thomas advised that she would see what she could do about the matter.

60.     On August 3, 2012, Inspector Alisa Petty, the officer in charge of the MPD Academy, asked Ms. McGinnis why she was in civilian clothes.  Ms. McGinnis tearfully explained the entire story to Inspector Petty and described how embarrassed and frustrated she

was.  Inspector Petty was very surprised and indicated this was the first she had heard of the matter.  Inspector Petty said she would try to get Ms. McGinnis an appointment at the clinic early the week of August 6, 2012.  Ms. McGinnis heard nothing on August 6 or August 7, 2012, despite seeing Inspector Petty several times during that period, and she continued training in her civilian clothes.

61.     On August 8, 2012, before the class received its OC spray training, there was a classroom session taught by Officer Boyd and Defendant Rosenthal.  Defendant Rosenthal asked a question and scanned the room for volunteers.  When no one volunteered, Defendant Rosenthal expressed dismay and said "nobody?"  At this point, Ms. McGinnis provided an answer. Defendant Rosenthal deliberately ignored Ms. McGinnis and again said "nobody?"  Defendant Rosenthal's conduct was intentionally designed to humiliate and embarrass Ms. McGinnis and to further cause her emotional distress.

62.     Later that day, Ms. McGinnis's class received OC spray training.  The class was sprayed directly across the eyes in an "X" pattern by Officer Boyd, as he was instructed to do by Lt. Rosenthal, but contrary to the training he received.

63.     As Ms. McGinnis watched her class undergo OC spray training, Inspector Petty walked over to find Ms. McGinnis crying.  Inspector Petty advised Ms. McGinnis that she had not contacted anyone at the clinic, but that she was "not doomed, just delayed."  After their conversation ended and still in tears, Ms. McGinnis picked up a chair to bring it back inside. Inspector Petty stopped Ms. McGinnis and intentionally embarrassed and humiliated her by taking the chair from her in front of her classmates and advising her that she is on limited duty and, therefore, cannot lift chairs.  Ms. McGinnis told Inspector Petty that she was capable of doing anything except take a direct OC spray to the eyes.  Ms. Petty took the chair, anyway.

64.     At no point during the OC spray training on August 8, 2012, did anyone—not Inspector Petty, Lt. Rosenthal, nor Officer Boyd—tell Ms. McGinnis that she could not be present due to her allergy.  So, Ms. McGinnis went back into the gym with her class after they completed the OC spray training.  Approximately 30 minutes later, Lt. Rosenthal intentionally humiliated and embarrassed Ms. McGinnis in front of her classmates by ordering her to leave the gym due to her OC spray allergy.

65.     On August 9, 2012, Ms. McGinnis picked up her blue uniform and graduation uniform.  The blue uniforms are the same ones worn by MPD officers.  Recruits are allowed to wear blue uniforms during their last two weeks of training, which serves as a rite of passage and means the recruit is about to graduate.

66.     From August 10-13, 2012, Ms. McGinnis continued with her regular training at the MPD Academy wearing her civilian clothes while her classmates began wearing their blue uniforms.

67.     On August 14, 2012, Ms. McGinnis and the rest of her class took photos to be used in the graduation brochure.  No one, including Sgt. Young, who pinned on Ms. McGinnis's collar brass, suggested that Ms. McGinnis would not graduate.

68.     Later that day, Ms. McGinnis took the final written exam and passed with an 85%, one of the highest scores in the class.

69.     On August 16, 2012, Ms. McGinnis attended class as usual and went to the gym for baton training.  Inspector Petty was present and intentionally humiliated and embarrassed Ms. McGinnis by openly asking members of the gym staff why she was at the training despite her being placed on limited duty.  Ms. McGinnis overheard a member of the gym staff advise

Inspector Petty that Ms. McGinnis was only on limited duty for purposes of the OC spray training.

70.     At the end of the day, Ms. McGinnis went to her appointment with Dr. Diba.  Dr. Diba advised Ms. McGinnis that she would remain on limited duty and gave her two additional forms for Dr. Okocha to fill out.  Ms. McGinnis then requested to see the Medical Services Director, Lt. Stroud.

71.     Lt. Stroud and Ms. McGinnis had an extended conversation that lasted approximately 25 minutes.  Lt. Stroud advised Ms. McGinnis that all officers are required to be OC spray certified and to carry OC spray while on duty.  Ms. McGinnis tearfully replied that she had already received two OC spray certifications and that she was capable of carrying OC spray, again explaining that she disclosed the issue numerous times and was not requesting an exemption, only to not be sprayed directly in the eyes.  While Ms. McGinnis was crying, Lt. Stroud then intentionally and callously inflicted emotional distress by stating that, had another MPD officer not called him on Ms. McGinnis's behalf, he would have fired her already.

72.     Lt. Stroud then ordered Ms. McGinnis to have the two forms filled out by Dr. Okocha and that he would put her back on full duty.  Lt. Stroud further advised that once Ms. McGinnis returned to full duty, she should "suck it up" and take the direct spray across the eyes.

73.     By August 17, 2012, Ms. McGinnis had completed nearly all of her required training, remained at the top of her class, and was a mere two weeks from graduating.  Ms. McGinnis went to work as usual, attended training, took a written exam on which she scored 100%, and went to the gym with her class.

74.     Around 11:30 a.m., Sgt. Young came into the gym and told Ms. McGinnis that he had to take her for a ride downtown.  Sgt. Butler joined them because MPD Academy policy

requires a female officer to escort another female officer or recruit. Ms. McGinnis asked Sgt.

Young if they were taking her downtown to fire her and he did not respond. Ms. McGinnis

asked him again and he replied "yes." Ms. McGinnis asked why she was being terminated. Sgt.

Young responded that he did not know, but that it was "bullshit."

75.    When Ms. McGinnis arrived downtown, Sergeant George Bernard handed her a

letter. This letter did not specify why Ms. McGinnis was being terminated.

76.    Sgt. Bernard asked Ms. McGinnis if she knew why she was being terminated.

Ms. McGinnis responded that she did not know why she was being fired. Sgt. Bernard stated

that Ms. McGinnis was being terminated because she lied to the department about a medical

condition.

77.    Ms. McGinnis stated that she told everyone who would listen, from the time she

disclosed it in her initial application, to telling co-workers and superior officers during training at

the MPD Academy, to telling MPD medical personnel before and during her tenure at the MPD

Academy, etc. Sgt. Bernard replied that the MPD was claiming it never knew about her

condition. Ms. McGinnis noticed that there was a Captain sitting in an adjacent room who

appeared to be listening to this conversation.

78.    Ms. McGinnis also noticed that Sgt. Bernard was carrying additional paperwork

that he did not show to her. Sgt. Bernard left this paperwork behind when he left the room and

Sgt. Young and Sgt. Butler began reading through it. Ms. McGinnis asked what the papers said

and Sgt. Young handed them to her.

79.    Included in Sgt. Bernard's materials was the medical history form on which Ms.

McGinnis disclosed her 2007 OC spray injury. Also included in these materials was a

memorandum dated August 14, 2012, from the Director of Human Resources, Diana Haines-

Walton, to the Chief of Police, Cathy Lanier, and the Assistant Chief of the Professional

Development Bureau.

80.     Ms. McGinnis was shocked to read the false and defamatory statements in the

memorandum, including that she: "failed to disclose her severe allergy to OC spray during the

recruitment process;" "deliberately and consciously made false statements to the Department

during the recruitment process;" "blatant[ly] fail[ed] to truthfully and completely disclose

information during the recruitment process;" did not disclose the allergy during her physical

examination; and "answered in the negative" on two medical certifications indicating that she did

not have any allergy to OC spray.

81.     Sgt. Bernard then returned to the room and asked where the packet of additional

paperwork was.  Sgt. Young told Sgt. Bernard that Ms. McGinnis was reading it.  Sgt. Bernard

became very upset, took the packet back, told Sgt. Young that Ms. McGinnis was not supposed

to see it, and asked Ms. McGinnis to leave the room.

82.     Sgt. Young and Sgt. Butler then took Ms. McGinnis back to the MPD Academy

where she had to sit in the cafeteria for two hours because she was advised she was being paid

until the end of the day and could not leave.  This further embarrassed and humiliated Ms.

McGinnis because it was obvious that she had been fired—she was wearing the shorts and t-shirt

that were in her locker instead of her training uniform like the rest of the recruits.

83.     Later that day, after Ms. McGinnis left, a Training Announcement was circulated

to all MPD officers advising that anyone who has never been OC spray certified must attend

training on either August 28 or August 30, 2012, with Lt. Rosenthal.  The Training

Announcement listed six MPD officers who had never been OC spray certified, despite at least

some of them being patrol officers for years.  One of these individuals was mere weeks from

retirement. These facts completely contradict and undermine Lt. Stroud's assertion that all MPD officers on street patrol must be OC spray certified.

84. The following Monday morning, August 20, 2012, Ms. McGinnis returned to the MPD Academy in her civilian attire in order to return her uniform. Again, she was forced to do this in front of classmates and other recruits and superior officers at the Academy.

## COUNT 1: 42 U.S.C. § 1983 Claim Against Defendants Rosenthal, Petty, Stroud, and Haines-Walton in Their Individual Capacities

85. Plaintiff repeats the allegations in paragraphs 1 through 84, which are incorporated herein by reference.

86. Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

87. The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. 5.

88. Ms. McGinnis had a property interest in her job serving the public at MPD.

89. Individual Defendants Rosenthal, Petty, Stroud, and Haines-Walton unreasonably conspired to terminate Ms. McGinnis under a false and defamatory pretext, and did so under color of state law, while acting in performance of their official duties within the ordinary course and scope of their employment, and without a judicial warrant.

90. Reasonable people in the Individual Defendants' position would have realized that Ms. McGinnis had a property interest in her position at the MPD Academy under the Fifth

Amendment and that this property interest could not be subjected to unreasonable deprivation without due process of law.

91.     The Individual Defendants unreasonably ignored clear evidence that Ms. McGinnis was being truthful about her prior disclosures of her medical condition.

92.     The Individual Defendants' conspiracy to terminate Ms. McGinnis was objectively unreasonable and disproportionate because Ms. McGinnis had disclosed her medical condition numerous times to MPD medical personnel, superior officers, fellow recruits, and in her initial application.

93.     The Individual Defendants' conspiracy to terminate Ms. McGinnis deprived her of a property interest without due process of law and without just compensation under the Fifth Amendment.

94.     The Individual Defendants' conspiracy to terminate Ms. McGinnis involved reckless or callous disregard for Ms. McGinnis's constitutional rights.

95.     As a direct and proximate result of the Individual Defendants' conduct, Plaintiff has been injured in various respects including, without limitation, suffering severe emotional distress and mental anguish due to the public humiliation she endured and a complete loss of future job opportunities in law enforcement due to the defamatory pretext under which she was terminated, all attributable to the deprivation of her constitutional and statutory rights guaranteed by the Fifth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

WHEREFORE Plaintiff demands judgment against Defendants Rosenthal, Petty, Stroud, and Haines-Walton for:

(a) $831,595 in special damages;

(b) $1 million in general compensatory damages;

(c) $3 million in punitive damages;

(d) pre- and post-judgment interest;

(e) reasonable attorneys' fees and costs as allowed under 42 U.S.C. § 1988(b); and

(f) such further relief as the Court may deem just and proper.

## COUNT II: 42 U.S.C. § 1983 Claim Against the District ("*Monell*" claim)

96.     Plaintiff repeats the allegations in paragraphs 1 through 95, which are incorporated herein by reference.

97.     Despite being trained by a paid third party consultant not to spray recruits directly in the eyes with OC spray, all of the officers at the MPD Academy still employed this tactic, at the insistence of Defendant Rosenthal.

98.     The District either did not have an adequate policy in place for OC spray training of MPD Academy recruits or did not properly implement such a policy.

99.     This failure allowed Defendant Rosenthal to implement her own pervasive, long-standing practice which was widely followed by other MPD officers conducting OC spray training at the Academy and, thus, constitutes a custom or usage with the force of law.

100.    Policymakers at MPD possessed actual or constructive knowledge of the manner in which Defendant Rosenthal conducted OC spray training, but did nothing to clarify or implement a policy to prevent Defendant Rosenthal and the Academy from implementing her own pervasive, long-standing practice.

101.    The District's failure to create or implement a sufficient policy regarding OC spray training meaningfully interfered with Plaintiff's right to due process of law and just compensation before being deprived of her property under the Fifth Amendment.

102.     As a direct and proximate result of the District's failure, Plaintiff has been injured in various respects, including the loss of her career in law enforcement, the unwarranted stigma of being terminated for dishonesty, as well as severe mental anguish due to the egregious nature of her loss, all attributable to the deprivation of her constitutional and statutory rights guaranteed by the Fifth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

WHEREFORE Plaintiff demands judgment against the District for:

(a) $831,595 in special damages;

(b) $1 million in general compensatory damages;

(c) pre- and post-judgment interest;

(d) reasonable attorneys' fees and costs as allowed under 42 U.S.C. § 1988(b);

(e) reinstatement of Plaintiff as a full MPD officer or, in the alternative, as a recruit at the MPD Academy at the same point in her training at which she was wrongfully terminated; and

(f) such further relief as the Court may deem just and proper.

**COUNT III:  Claim for Intentional Infliction of Emotional Distress Against the District**

103.     Plaintiff repeats the allegations in paragraphs 1 through 102, which are incorporated herein by reference.

104.     Defendants' Rosenthal, Petty, and Stroud, acting in their official capacities, intentionally and deliberately embarrassed and humiliated the Plaintiff, an outstanding recruit by any objective measure.

105.     Defendant Rosenthal, in front of all of Plaintiff's classmates, openly questioned the Plaintiff's presence after a training session and removed her from the course 30 minutes after the recruits were sprayed, ostensibly due to Plaintiff's OC spray allergy.

106.     Defendant Rosenthal's conduct was deliberately and intentionally designed to embarrass and humiliate the Plaintiff.

107.     Defendant Rosenthal's willful, knowing, and wrongful decision to embarrass and humiliate the Plaintiff in front of her peers constitutes extreme and outrageous conduct under community standards of decency in the specific context in which this incident took place.

108.     Defendant Rosenthal's intentional embarrassment and humiliation of Plaintiff while acting in her official capacity involved reckless or callous disregard for basic community standards of decency in the specific context presented.

109.     Defendant Rosenthal's intentional embarrassment and humiliation of Plaintiff while acting in her official capacity actually caused severe emotional distress to Plaintiff.

110.     As a direct and proximate result of Defendant Rosenthal's actions while acting in her official capacity, Plaintiff has suffered severe mental anguish, for which Plaintiff has sought and continues to seek psychological treatment and counseling.

111.     Defendant Petty, in front of all of Plaintiff's classmates, took a chair from Plaintiff and advised Plaintiff that she was on limited duty and, therefore, could not lift chairs. Despite Plaintiff's protestations that she was capable of doing anything except taking a direct OC spray to the eyes, Defendant Petty took the chair, anyway.

112.     On a later occasion, Defendant Petty, knowing full well that Plaintiff was only on limited duty due to her allergy to OC spray, openly asked members of the gym staff in front of all of Plaintiff's classmates why Plaintiff was at baton training despite being placed on limited duty.

113.     Defendant Petty's conduct was deliberately and intentionally designed to embarrass and humiliate the Plaintiff.

114.    Defendant Petty's willful, knowing, and wrongful decision to embarrass and humiliate the Plaintiff in front of her peers constitutes extreme and outrageous conduct under community standards of decency in the specific context in which this incident took place.

115.    Defendant Petty's intentional embarrassment and humiliation of Plaintiff while acting in her official capacity involved reckless or callous disregard for basic community standards of decency in the specific context presented.

116.    Defendant Petty's intentional embarrassment and humiliation of Plaintiff while acting in her official capacity actually caused severe emotional distress to Plaintiff.

117.    As a direct and proximate result of Defendant Petty's actions while acting in her official capacity, Plaintiff has suffered severe mental anguish, for which Plaintiff has sought and continues to seek psychological treatment and counseling.

118.    Defendant Stroud, after listening to Plaintiff explain the numerous and various ways in which she disclosed her allergy to OC spray prior to being put on limited duty, callously told her that he would have fired her already had another MPD officer not called him on Plaintiff's behalf.  Defendant Stroud further callously told Plaintiff to "suck it up" and take the OC spray directly in the eyes, despite Plaintiff's allergy.

119.    Defendant Stroud's conduct was deliberately and intentionally designed to embarrass and humiliate the Plaintiff.

120.    Defendant Stroud's willful, knowing, and wrongful decision to embarrass and humiliate the Plaintiff after she was already in an emotionally fragile state constitutes extreme and outrageous conduct under community standards of decency in the specific context in which this incident took place.

121.    Defendant Stroud's intentional embarrassment and humiliation of Plaintiff while acting in his official capacity involved reckless or callous disregard for basic community standards of decency in the specific context presented.

122.    Defendant Stroud's intentional embarrassment and humiliation of Plaintiff while acting in his official capacity actually caused severe emotional distress to Plaintiff.

123.    As a direct and proximate result of Defendant Stroud's actions while acting in his official capacity, Plaintiff has suffered severe mental anguish, for which Plaintiff has sought and continues to seek psychological treatment and counseling.

WHEREFORE Plaintiff demands judgment against the District for:

(g)  $445 in special damages;

(h)  $1 million in general compensatory damages;

(i)  pre- and post-judgment interest;

(j)  reasonable attorneys' fees and costs as allowed under 42 U.S.C. § 1988(b);

(k)  reinstatement of Plaintiff as a full MPD officer or, in the alternative, as a recruit at the MPD Academy at the same point in her training at which she was wrongfully terminated; and

(l)  such further relief as the Court may deem just and proper.

## COUNT IV:  Claim for Defamation Against the District

124.    Plaintiff repeats the allegations in paragraphs 1 through 123, which are incorporated herein by reference.

125.    Defendant Haines-Walton, acting in her official capacity, willfully, knowingly, wrongfully, and/or negligently published a defamatory statement.

126.     Because Plaintiff disclosed her allergy to OC spray numerous times both prior to her hiring and during the course of her brief career at MPD, Defendant Haines-Walton's characterization of Plaintiff as a liar is defamatory.

127.     Furthermore, at least two individuals, Sgt. Young and Sgt. Butler, read the Haines-Walton Memorandum and, based on information and belief, others have likely seen the memo or heard about the rationale for Plaintiff's termination.

128.     Sgt. Young and Sgt. Butler were merely escorting the Plaintiff from the MPD Academy to MPD headquarters and were not essential to the decision to terminate the Plaintiff and had no official business reading the memorandum.  Nor do any other individuals who, based on information and belief, have seen the memo have any official business knowing the defamatory pretext for Plaintiff's termination.

129.     Defendant Haines-Walton's willful, knowing, wrongful, negligent and/or reckless publication of a defamatory memorandum while acting in her official capacity directly and proximately injured the Plaintiff in various respects, including her complete inability to secure future employment in law enforcement, as well as causing severe mental anguish due to the nature of the defamation for which Plaintiff has sought and continues to seek psychological treatment and counseling.

WHEREFORE Plaintiff demands judgment against the District for:

(a)  $831,595 in special damages;

(b)  $1 million in general compensatory damages;

(c)  pre- and post-judgment interest;

(d)  reasonable attorneys' fees and costs as allowed under 42 U.S.C. § 1988(b);

(e)  reinstatement of Plaintiff as a full MPD officer or, in the alternative, as a recruit at

the MPD Academy at the same point in her training at which she was wrongfully

terminated; and

(f)  such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury on all counts for all issues triable by a jury.

Respectfully submitted,

_____/s/ Benjamin G. Chew_____
Benjamin G. Chew (D.C. Bar # 418577)
Nigel L. Wilkinson (D.C. Bar # 466221)
Thomas J. Craven (D.C. Bar # 995819)[2]
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
E-mail: bchew@pattonboggs.com
         nwilkinson@pattonboggs.com
         tcraven@pattonboggs.com

*Counsel for Plaintiff*
*Brandy McGinnis*

Dated:  August 15, 2013

---

[2] Application to the U.S. District Court for the District of Columbia pending.