**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
BRANDY MCGINNIS,                )
                                )
            Plaintiff,          )
                                )
       v.                       ) Civil Action No. 13-1254 (EGS)
                                )
DISTRICT OF COLUMBIA, et al.,   )
                                )
            Defendants.         )
_____)

## MEMORANDUM OPINION

Brandy McGinnis brings this action against the District of
Columbia ("the District") and four employees of the Metropolitan
Police Department ("the MPD"). Ms. McGinnis claims that her
constitutionally protected liberty interest was violated when
she was falsely accused of having lied on her application to the
MPD and terminated from employment. Ms. McGinnis also brings
claims for intentional infliction of emotional distress and
defamation. Pending before the Court is defendants' motion to
dismiss plaintiff's liberty-interest claims. Upon consideration
of the motion, the response and reply thereto, the applicable
law, and the entire record, the Court **DENIES** defendants' motion.

## I.   Background

### A.   Ms. McGinnis Becomes a Police Officer in Florida.

Ms. McGinnis is a former police officer with the Aventura
Police Department in Aventura, Florida. _See_ First Am. Compl.,

ECF No. 10 ¶ 2. She was "a well-respected and decorated police officer" during her time in Aventura, and "received several awards, promotions, and recognitions" there. *Id.* ¶¶ 2, 26.

Prior to becoming a police officer in Aventura, Ms. McGinnis attended the Miami-Dade School of Justice for training. *See id.* ¶ 3. During training, Ms. McGinnis "discovered that she has a medical condition involving a severe allergy to" pepper spray (which is also known as oleoresin capsicum or "OC" spray). *Id.* ¶¶ 3, 27. This arose when Ms. McGinnis "suffered an unusually harsh reaction to [OC] spray." *Id.* ¶ 28. Ms. McGinnis had been "sprayed directly in the eyes," and she "suffered permanent damage to her right eye which requires her to wear eyeglasses at night and while reading." *Id.* ¶¶ 3-4. She was ordered by a supervisor to seek medical treatment and was ultimately diagnosed with "both an allergy and a hypersensitivity to OC spray." *Id.* ¶¶ 28-29. This allergy "does not prevent her from carrying or even using OC spray," so long as she "avoid[s] a direct spray to the eyes." *Id.* ¶ 30. Accordingly, the incident had no effect on her training, and she graduated successfully. *See id.* ¶ 4.

**B.  Ms. McGinnis Applies to Become a Police Officer in the District of Columbia.**

On December 5, 2011, Ms. McGinnis filled out an application for employment with the MPD. *See id.* ¶ 34. On this application,

Ms. McGinnis "disclosed the OC spray allergy, but noted that she is certified to use and carry OC spray." *Id.* On December 14, 2011, she interviewed with a background investigator. *See id.* ¶ 35. Ms. McGinnis informed the investigator of her allergy and he "indicated that this would not be a problem." *Id.*

The next step in the application process was a physical examination, which Ms. McGinnis took on January 17, 2012. *See id.* ¶ 36. During the examination, she completed "a medical history form that inquired about drug and sinus allergies, but not food or other types of allergies," checked a box which indicated that she had an eye injury, and "in the space provided . . . to explain . . . disclosed that she suffered an eye injury from OC spray in 2007." *Id.* During the physical examination, Ms. McGinnis also informed the doctor "that she had an allergy to OC spray . . . that there was no specific place for her to make the OC spray allergy disclosure on the medical history form, but that she disclosed the eye injury she suffered [as a result of OC spray]." *Id.* ¶ 37. The doctor informed her that "this would not be a problem since she disclosed the allergy to [the investigator] and was already certified," and indicated that "he would make a note of it in Ms. McGinnis's file." *Id.*

**C. Ms. McGinnis Begins Training at the MPD Academy.**

Ms. McGinnis was hired by the MPD on January 25, 2012. *See id.* ¶ 38. On January 31, 2012, she began training at the MPD Academy

"where she immediately excelled and was made Class Leader on the second day of training." *Id.* ¶ 5. Her allergy was discussed soon after training began, when Ms. McGinnis "advised [Sergeant] Young and Class Officer Kelwin Ford . . . that she was allergic to OC spray." *Id.* ¶ 41. When Class Officer Ford expressed his belief that everyone is allergic to OC spray, Ms. McGinnis explained that "although everyone suffers irritation from OC spray, people with an allergy suffer much more significant and longer-lasting effects following a direct spray to the eyes." *Id.* Class Officer Ford indicated "that they would deal with the issue when the time came for OC spray training." *Id.*

Ms. McGinnis reminded Sergeant Young of her OC spray allergy in May 2012, and again in June 2012, at which point Sergeant Young told her "to get something in writing." *Id.* ¶¶ 43-44. Accordingly, on July 17, 2012, Ms. McGinnis provided him a letter from Major William Washa of the Aventura Police Department, which indicated that Major Washa had witnessed Ms. McGinnis's reaction to OC spray. *See id.* ¶ 45. Sergeant Young said that he would give the letter to the OC spray instructor, Lieutenant Ashley Rosenthal, and "advised that it should not be a problem." *Id.*

Ms. McGinnis alleges that she expected to participate fully in the MPD's OC spray training because "according to the other MPD officers who were certified to conduct the . . . training . . .

they were . . . trained . . . to spray recruits across the forehead rather than directly in the eyes." *Id.* ¶ 47. Ms. McGinnis alleges that Lieutenant Rosenthal was also trained to spray across the forehead, "but because MPD apparently lacks a clear policy for OC spray training and because Lt. Rosenthal evidently believes this method is not effective enough, Lt. Rosenthal has implemented her own custom . . . of spraying recruits . . . across the eyes." *Id.* ¶ 48.

**D.  Ms. McGinnis is Placed on Limited Duty.**

On July 20, 2012, Ms. McGinnis was told to go to the medical clinic to be exempted from OC spray training. *See id.* ¶ 49. Ms. McGinnis protested "that she was not asking to be exempt, she was just requesting that she not be sprayed directly in the eyes," *id.*, but Lieutenant Rosenthal insisted she meet with an MPD doctor. *See id.* ¶ 50. That doctor "placed Ms. McGinnis on limited duty and advised that [she] would need to see an allergy specialist." *Id.* When Ms. McGinnis next reported to the MPD Academy, two class officers "told her to remove her uniform and put on civilian attire because she was on limited duty." *Id.* ¶ 53. Ms. McGinnis's responsibilities as Class Leader were also reassigned. *See id.* Later, Ms. McGinnis attended her appointment with the allergy specialist and the doctor agreed to provide the MPD with a letter "indicating that Ms. McGinnis has an 'extra sensitivity to pepper spray.'" *Id.* ¶¶ 55–56.

The following week, Ms. McGinnis went to the MPD clinic as directed, and "was advised that she could not be exempted from the OC spray training." *Id.* ¶ 57. Her doctor called the Medical Services Director, Gregory Stroud, "advised Ms. McGinnis that she was still on limited duty," and directed Ms. McGinnis to report back to the clinic on August 16, 2012. *See id.*

Ms. McGinnis continued to report to the Academy. On August 3, 2012, she encountered Inspector Alisa Petty, the individual in command of the Academy, who asked her why she was wearing civilian clothing. *See id.* ¶ 60. After Ms. McGinnis explained, Inspector Petty "indicated this was the first she had heard of the matter." *Id.* Five days later, when Ms. McGinnis's class underwent OC spray training—and were sprayed "directly across the eyes," *id.* ¶ 62—Inspector Petty advised Ms. McGinnis that "she was 'not doomed, just delayed.'" *Id.* ¶ 63. Although Ms. McGinnis was permitted to be present during the OC spray training, Lieutenant Rosenthal later told her to leave the area "due to her allergy." *See id.* ¶ 64.

Over the next week, Ms. McGinnis continued to participate in training, had her photograph taken to be used in the graduation program, and took her final written exam, which she "passed with an 85%, one of the highest scores in the class." *Id.* ¶¶ 65–68. On August 16, 2012, she attended an appointment at the MPD clinic, was "advised . . . that she would remain on limited

duty," and was given additional documents for her allergy specialist to complete, including a request "to clarify whether Ms. McGinnis has an allergy to OC spray" and a request for a determination "whether Ms. McGinnis is 'capable of performing the full range of duties required of a police officer.'" *Id.* ¶ 70. Ms. McGinnis then spoke with Medical Services Director Stroud, who informed her "that all officers are required to be OC spray certified" and "that, had another MPD officer not called him on Ms. McGinnis's behalf, he would have fired her already." *Id.* ¶ 71. Director Stroud "further advised that once Ms. McGinnis returned to full duty, she should 'suck it up' and take the direct spray across the eyes." *Id.* ¶ 72.

**E.  Ms. McGinnis is Terminated from Employment with the MPD.**

On August 17, 2012, Sergeants Young and Butler drove Ms. McGinnis to the MPD headquarters. *See id.* ¶ 75. Ms. McGinnis asked Sergeant Young if she was being fired and he said that she was; when she asked why, Sergeant Young indicated that he did not know. *See id.* Upon arrival, Sergeant George Bernard gave Ms. McGinnis a letter and asked her "if she knew why she was being terminated." *Id.* ¶¶ 76–77. When Ms. McGinnis responded that she did not, Sergeant Bernard said that it was "because she lied to the department about a medical condition." *Id.* ¶ 77. The MPD, Sergeant Bernard indicated, "was claiming it never knew about her condition." *Id.* ¶ 78.

Sergeant Bernard exited the room and left behind paperwork that Sergeants Young and Butler began to read. *See id.* ¶ 80. Ms. McGinnis also read the materials, which included "the medical history form on which Ms. McGinnis disclosed her 2007 OC spray injury" as well as an August 14, 2012 memorandum from the MPD's Director of Human Resources, Diana Haines-Walton, to the Chief of Police ("the Haines-Walton Memo"). *See id.* ¶ 81. The Memo stated that Ms. McGinnis: (1) "'failed to disclose her severe allergy to OC spray during the recruitment process'"; (2) "'deliberately and consciously made false statements to the Department during the recruitment process'"; (3) "'blatant[ly] fail[ed] to truthfully and completely disclose information during the recruitment process'"; (4) "did not disclose the allergy during her physical examination"; and (5) "'answered in the negative' on two medical certifications indicating that she did not have any allergy to OC spray." *Id.* ¶ 82 (alterations in original). In addition to Sergeants Young and Butler, Ms. McGinnis alleges that "[o]thers in the MPD and at the Academy have become aware of the defamatory rationale for [her] termination despite their having no legitimate business-related reason to know" and that "[t]he defamatory Haines-Walton Memorandum remains in [her] personnel file which is potentially available to prospective employers or other government officials." *Id.* ¶¶ 102–03.

The full story of Ms. McGinnis's termination remains unclear, but she alleges that defendants Rosenthal, Petty, Stroud, and Haines-Walton "conspired to terminate [her] under a false and defamatory pretext" and that they "ignored clear evidence that Ms. McGinnis was being truthful about her prior disclosures of her medical condition." *Id.* ¶¶ 93, 95. Ms. Haines-Walton authored the allegedly defamatory memo, while defendants Rosenthal, Petty, and Stroud allegedly "encouraged the District to terminate [her] based on this defamatory pretext." *Id.* ¶¶ 11, 81–82.

Ms. McGinnis was not provided with notice of the charges or an opportunity to present her side of the story. *See id.* ¶ 100. This, she alleges, is because the "MPD and the District apparently either have no policy providing for such notice and opportunity to be heard or have a policy, custom, usage or practice of not providing such notice and opportunity when an employee is being terminated for reasons that would affect his or her reputation and/or stigmatize him or her." *Id.* ¶ 122.

After her termination from the MPD, Ms. McGinnis "applied for numerous positions in law enforcement, but has not been hired by any law enforcement agency." *Id.* ¶ 107.[1] She attributes this to

---

[1] Ms. McGinnis provided further detail about her job search in her opposition brief. *See* Opp. at 6 & n.2. The Court does not consider these allegations because "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a

the fact that, "[e]ach time she applies for a new position in law enforcement, [she] is required to truthfully describe her employment history and the reasons for her separation from previous employers, including the defamatory rationale for her termination by MPD." *Id.* ¶ 105.

## F.   Procedural History

On August 15, 2013, Ms. McGinnis filed this lawsuit against the District of Columbia, Lieutenant Ashley Rosenthal, Inspector Alisa Petty, Lieutenant Gregory Stroud, and Diana Haines-Walton. She alleged violations of her Fifth Amendment rights against the individual defendants and the District, as well as claims for intentional infliction of emotional distress and defamation against the District. *See* Compl. ¶¶ 88–154. After the defendants moved to dismiss the federal claims on the grounds that plaintiff lacked a protected property interest in continued employment, Defs.' First Mot. to Dismiss, ECF No. 6, plaintiff filed a consent motion for leave to file an amended complaint to correct her complaint to allege a violation of her liberty interest. *See* Mot. for Leave, ECF No. 9; First Am. Compl., ECF No. 10.

On January 17, 2014, the defendants moved to dismiss plaintiff's Fifth Amendment claims or, in the alternative, for

---

motion to dismiss." *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (quotation marks omitted).

summary judgment on those claims. *See* Defs.' Mot. to Dismiss ("Mot."), ECF No. 13. Plaintiff filed her opposition brief on February 18, 2014 and objected to the defendants' request for summary judgment as premature under Federal Rule of Civil Procedure 56(d). *See* Opp. to Mot. ("Opp."), ECF No. 15; Rule 56(d) Aff., ECF No. 15-1. The defendants filed their reply brief, which indicated that they no longer request summary judgment, on March 10, 2014. *See* Reply in Supp. of Mot. ("Reply"), ECF No. 18. In July 2014, at the Court's request, the parties filed supplemental briefs addressing the D.C. Circuit's decision in *McCormick v. District of Columbia*, 752 F.3d 980 (D.C. Cir. 2014). *See* Pl.'s Suppl. Br., ECF No. 20; Defs.' Suppl. Br., ECF No. 21.

## II.  Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted). While detailed factual allegations are not necessary, plaintiff must plead enough facts to "raise a right to relief above the speculative level." *Id.*

When ruling on a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). The Court must construe the complaint liberally in plaintiff's favor and grant plaintiff the benefit of all reasonable inferences deriving from the complaint. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court must not accept plaintiff's inferences that are "unsupported by the facts set out in the complaint." *Id.* "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Threadbare recitals of "the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. Analysis

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. Amend. V. Ms. McGinnis asserts that the defendants' actions implicate the liberty interest protected by that Amendment because they wrongly terminated her for lying on her job application and provided her neither notice nor an opportunity to contest the allegations.

As a general rule, "persons whose future employment prospects have been impaired by government defamation 'lack . . . any constitutional protection for the interest in reputation.'" *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)) (alteration in original). This is especially true of at-will employees, who may be "discharge[d] . . . at any time and for any reason, or for no reason at all." *Kassem v. Wash Hosp. Ctr.*, 513 F.3d 251, 254 (D.C. Cir. 2007); *see also McCormick,* 752 F.3d at 987 ("Normally, one cannot be deprived unlawfully of something to which one had no legally protected right before the deprivation."). There are, however, narrow exceptions to this doctrine, drawn from the Supreme Court's decision in *Board of Regents v. Roth*, 408 U.S. 564 (1972). "A claim for deprivation of a liberty interest without due process based on allegedly defamatory statements of government officials . . . may proceed on one of two theories: a 'reputation-plus' claim or a 'stigma or disability' claim." *Fonville v. District of Columbia*, No. 02-2353, 2014 WL 1427780, at *7 (D.D.C. Apr. 14, 2014).

The reputation-plus theory is implicated when the government makes a "charge against [the employee] that might seriously damage his standing and associations in the community," *Roth*, 408 U.S. at 573, and does so in connection with a termination or other change in employment status. *See O'Donnell v. Barry*, 148

13

F.3d 1126, 1140 (D.C. Cir. 1998). "Although the conceptual basis
for reputation-plus claims is not fully clear, it presumably
rests on the fact that official criticism will carry much more
weight if the person criticized is at the same time demoted or
fired." *Id.* The stigma theory relates to situations where a
government action "foreclosed [the employee's] freedom to take
advantage of other employment opportunities." *Roth*, 408 U.S. at
573. Stigma "does not depend on official speech, but on a
continuing stigma or disability arising from official action."
*O'Donnell*, 148 F.3d at 1140.

Defendants argue that plaintiff's Fifth Amendment claims must
be dismissed because she has failed to state a claim under
either theory. The individual defendants also argue that Ms.
McGinnis failed to allege facts connecting defendants Rosenthal,
Petty, and Stroud to the constitutional violation and that
defendant Haines-Walton is entitled to qualified immunity.
Finally, the District argues that plaintiff's Fifth Amendment
claim against it should be dismissed for lack of a municipal
policy or custom connecting the District to any wrongdoing. The
Court first addresses plaintiff's stigma theory and the
individual defendants' arguments that they cannot be held liable
under that theory. Next, the Court addresses plaintiff's
reputation-plus theory and the individual defendants' arguments
against liability under that theory. Finally, the Court

addresses the District's argument that it cannot be liable for
any constitutional violation because no municipal policy or
custom was the moving force behind the alleged violations.

**A.   Ms. McGinnis's Stigma Theory Against the Individual
Defendants**

A court faced with a claim for qualified immunity must
analyze: "(1) 'whether a constitutional right would have been
violated on the facts alleged,' and (2) 'whether the right was
clearly established' at the time of the violation." *Shaw v.
District of Columbia*, 944 F. Supp. 2d 43, 54 (D.D.C. 2013)
(quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Supreme
Court has given judges flexibility "to exercise their sound
discretion in deciding which of the two prongs . . . should be
addressed first in light of the circumstances in the particular
case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).
Because only one individual defendant raises qualified immunity
and Ms. McGinnis's claims against the individual defendants
raise the same legal issues as her claim against the District,
the Court addresses the constitutional question first, before
analyzing whether any right was clearly established.

   *1.   Ms. McGinnis Alleged a Violation of Her Fifth
        Amendment Right Under the Stigma Theory.*

The stigma theory "provides a remedy where the terminating
employer imposes upon the discharged employee a stigma or other
disability that foreclosed the plaintiff's freedom to take

advantage of other employment opportunities." *McCormick*, 752 F.3d at 988 (quotation marks and alterations omitted). "[T]he 'stigma' claim, unlike the reputation-plus claim, 'does not depend on official speech' but on a 'stigma or disability arising from official action.'" *Id.* (quoting *O'Donnell*, 148 F.3d at 1140).

Defendants argue that Ms. McGinnis must allege active publication by the government of the reasons for her termination to state a claim under the stigma theory. *See* Mot. at 10–14; Reply at 5–8. Although defendants argue that the D.C. Circuit's decision in *McCormick* supports their argument, Defs.' Suppl. Br., ECF No. 21, the opposite is true. In that case, a correctional officer who was terminated for assaulting a handcuffed inmate disputed the results of the investigation that led to his termination. *See McCormick*, 752 F.3d at 982–83. He based his stigma claim on allegations that his termination for assaulting an inmate would preclude him from further employment as a correctional officer because he would have to inform prospective employers of it. *See id.* at 987.

The D.C. Circuit first noted that Mr. McCormick's "factual theory is that the appellees took the official act of firing him" and "[h]e cannot obtain other employment in his chosen field, therefore he has suffered stigma[, which] arises from his having to tell prospective employers why he was fired." *Id.* at

988. The Circuit then stated that "the only official act committed by the defendants is the termination" and "[t]he termination of an at-will employee is not sufficient to establish the deprivation of protected liberty interests." *Id.* The Circuit went on to assert that "[t]he Supreme Court in *Bishop v. Wood* effectively dispose[d] of McCormick's claims." *Id.* (citation omitted).

While these passages appear at first glance to support the defendants, the Circuit went on to note that, while *Bishop* may dispose of a reputation-plus theory in these circumstances, Mr. McCormick also asserted "in reliance on the stigma theory" an actionable liberty interest "even though he was an at-will employee and there was no government publication of derogatory information about him." *Id.* at 989. Indeed, the Circuit emphasized that "*Bishop v. Wood* does not address this understanding" and "does not dispose of this theory" and that prior Circuit precedent regarding the stigma theory "discussed— not communication by the government—but the plaintiff's remaining reasonable job opportunities in the field." *Id.* (citing *O'Donnell*, 148 F.3d at 1140–41). The Circuit then noted that if the plaintiff "was as free as before to seek another job," he "plainly . . . had not made out a case that he was broadly precluded from his chosen profession":

> Mr. McCormick, in contrast, cite[d] deposition testimony [from corrections officials] to the effect that he can never again be employed in the corrections field and that therefore, his termination implicates his liberty interest. Although that testimony is not as compelling as Mr. McCormick suggests, it is arguably sufficient to establish a genuine dispute as to a material fact—namely whether the circumstances of the termination had the broad effect of barring him from further employment in his chosen profession.

*Id.* (citations, quotation marks, and alteration omitted).

Defendants' reading of *McCormick*, therefore, is incorrect. Affirmative publication by the government is not a necessary element of a stigma claim so long as the plaintiff alleges *why* the government action has the effect of precluding her from future employment.

To survive a motion to dismiss, then, Ms. McGinnis must show that her termination "has worked a change in [her] status under law, either by (a) automatically excluding her from a definite range of employment opportunities . . . or (b) broadly precluding her from continuing in her chosen career." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994). Automatic exclusion, which may arise, for example, through "formal[] debar[ment]," *Trifax Corp.*, 314 F.3d at 643, has not been alleged. The question is thus whether plaintiff's termination for lying on her application will broadly preclude her from obtaining future employment in law enforcement to the point that it will "'seriously affect[], if not destroy[]' [her]

18

ability to pursue [her] chosen profession." *O'Donnell*, 148 F.3d
at 1141 (quoting *Kartseva*, 37 F.3d at 1529). "[I]f [she] has
merely lost one position in her profession but is not foreclosed
from reentering the field, she has not carried her burden."
*Kartseva*, 37 F.3d at 1529.

Alleging broad preclusion is not a mathematical exercise. Ms.
McGinnis need not plead a particular "duration of unemployment
[to] convert her stigma from implausible to plausible." *Campbell
v. District of Columbia*, 972 F. Supp. 2d 38, 46 (D.D.C. 2013).
At a minimum, she must allege that she has applied for and been
rejected from other positions in her field. *See Orange v.
District of Columbia*, 59 F.3d 1267, 1275 (D.C. Cir. 1995)
(denying stigma claim where plaintiffs had not subsequently
applied for any similar jobs); *Dave v. D.C. Metro. Police Dep't*,
926 F. Supp. 2d 247, 252 (D.D.C. 2013) (granting summary
judgment where "plaintiff has never sought other law enforcement
positions"). Relatedly, she cannot have obtained a similar job
after her termination. *See O'Donnell*, 148 F.3d at 1141 (former
Deputy Chief of Police in Washington, D.C. did not suffer stigma
where he obtained employment as Chief of Police in a small
town).

Difficulty obtaining a job in the field, while necessary, is
not sufficient because it "might easily be explained in other
ways." *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507

19

(D.C. Cir. 1995). Ms. McGinnis must also allege that the government action is at fault for the difficulty, or at least placed a "significant roadblock" in her path. *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 96 (D.D.C. 2011). In *McCormick*, for example, the plaintiff submitted "deposition testimony [by correctional officials] to the effect that he can never again be employed in the corrections field." 752 F.3d at 989. At the motion to dismiss stage, allegations that a termination "denigrated the plaintiff's professional competence and impugned his personal reputation in such a fashion as to effectively put a significant roadblock in his ability to obtain other employment," are sufficient. *See Holman v. Williams*, 436 F. Supp. 2d 68, 80 (D.D.C. 2006).

Ms. McGinnis's allegations are sufficient to state a claim. She asserts that she has "applied for numerous positions in law enforcement, but has not been hired by any law enforcement agency." First Am. Compl., ECF No. 10 ¶ 107. Ms. McGinnis further alleges that the reason for her inability to obtain a position is her termination: "Each time she applies for a new position in law enforcement, [she] is required to truthfully describe her employment history and the reasons for her separation from previous employers, including the defamatory rationale for her termination by MPD." *Id.* ¶ 105. Although defendants view this connection as attenuated, it is identical

to the connection recognized by the D.C. Circuit in *McCormick*. *See* 752 F.3d at 989. This is sufficient at this stage to allege that the MPD's action placed "a significant roadblock" in her path. *See Payne*, 773 F. Supp. 2d at 96. Moreover, Ms. McGinnis's prior experience, which included years as a police officer and many awards, arguably supports her allegations that her failure to obtain employment is related to the MPD's action. *See Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 341–42 (D.D.C. 1999).

Defendants respond that "'it is doubtful that the silent actions of a single agency within a single municipal government can have a sufficiently broad effect to alter an individual's legal rights to such a degree as to implicate a liberty interest.'" Mot. at 12 (quoting *Dave*, 926 F. Supp. 2d at 252). This may be true where the reason for an individual's termination cannot become known to any prospective employers. *See Dave*, 926 F. Supp. 2d at 249 (even the plaintiff was unaware of the reasons until after litigation began). Here, however, the MPD's silent actions were amplified because plaintiff *must* share them with prospective employers in her field. *See* First Am. Compl., ECF No. 10 ¶ 105. As *McCormick* demonstrates, a stigma claim may stand where an agency's silent actions will be communicated to prospective employers and will mean that the

plaintiff "can never again be employed in the . . . field." 752 F.3d at 989.

Discovery may reveal that the MPD's silent actions remain silent, or that plaintiff's termination poses "nothing more than a competitive disadvantage." Mot. at 11. At this stage of proceedings, however, the Court must accept Ms. McGinnis's claim that her termination and the government's allegations of serious dishonesty must be shared with future employers and that those allegations implicate a core requirement of the law-enforcement profession, such that she cannot obtain further employment in the field. *See* First Am. Compl., ECF No. 10 ¶¶ 105, 107. Accordingly, Ms. McGinnis has stated a Fifth Amendment claim under the stigma theory.[2]

> 2. *Ms. Haines-Walton is Not Entitled to Qualified Immunity and Each Individual Defendant Participated in the Constitutional Violation.*

Having established that Ms. McGinnis alleged a violation of her Fifth Amendment right, "[w]hat remains is to determine whether . . . any of the individual defendants can be held liable . . . under 42 U.S.C. § 1983." *Elkins v. District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012). Ms. McGinnis must show "'that each [one], through the official's own individual

---

[2] Ms. McGinnis properly alleged the second component of a due-process claim—that she was not provided the process due to her, *Reeve Aleutian Airways Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993)—by claiming that she received no process at all. *See* First Am. Compl., ECF No. 10 ¶ 100.

actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*,
556 U.S. at 676) (alteration in original). Moreover, a defendant
may be entitled to qualified immunity, which is "an immunity
from suit rather than a mere defense to liability." *Pearson*, 555
U.S. at 231 (quotation marks omitted).

Government officials are entitled to qualified immunity
"'insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known.'" *Butera v. District of Columbia*, 235 F.3d
637, 646 (D.C. Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457
U.S. 800, 818 (1982)). "Clearly established for purposes of
qualified immunity means that the contours of the right must be
sufficiently clear that a reasonable official would understand
what he is doing violates that right." *Shaw*, 944 F. Supp. 2d at
54 (quotation marks omitted). Put another way, "existing
precedent must have placed the . . . constitutional question
beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)
(quotation marks omitted). This analysis "depends substantially
upon the level of generality at which the relevant [law] is to
be identified," so a court must ensure that the right was
"'clearly established' in a more particularized . . . sense."
*Anderson v. Creighton*, 483 U.S. 635, 639, 640 (1987). This is
not to say that an identical fact pattern must previously have

been adjudicated, but "in the light of pre-existing law the
unlawfulness must be apparent." *Id.* at 640.

Ms. Haines-Walton contends that she is entitled to qualified
immunity. By contrast, defendants Rosenthal, Petty, and Stroud
did not raise qualified immunity, arguing only that Ms. McGinnis
failed to allege facts to support an inference that their "own
individual actions," *Iqbal*, 556 U.S. at 676, caused any
constitutional violation.

### a. Haines-Walton

There appears to be no dispute that Ms. Haines-Walton's "own
individual actions," *id.*, caused the alleged constitutional
violation. She allegedly wrote the defamatory memorandum
memorializing the reasons for Ms. McGinnis's termination and
participated in the "conspiracy" to terminate Ms. McGinnis for
those reasons. *See* First Am. Compl., ECF No. 10 ¶¶ 81–82, 93.
This is connected to the constitutional harm, which flows from
the act of terminating Ms. McGinnis for reasons that must be
shared with prospective employers and will preclude her from
employment in her field.

Ms. Haines-Walton alleges that she is entitled to qualified
immunity "because a reasonable officer in her position could not
have anticipated that recommending Plaintiff for termination
would implicate liberty interest violations." Mot. at 16.
Specifically, she claims that she could not have anticipated

violating a constitutional right "because MPD did not make the reasons . . . public" and any stigma claim "did not arise until after Plaintiff was terminated." *Id.* at 17. Plaintiff responds that "[t]he 'contours' of Ms. McGinnis's right to her constitutional liberty interest" were clearly established because "[t]he well-established and protected right in this case is the opportunity to be heard before being slandered and defamed." Opp. at 23. Plaintiff defines the right at too high a level of generality, so the Court examines the right at a more specific level. *See Anderson*, 483 U.S. at 640.

To begin, it was clearly established that a stigma claim could arise when a government action broadly precludes an employee from further employment in her field. In *Kartseva*, the Circuit made clear that a plaintiff could state such a claim when the government action "does not have [a] *binding* effect, but nevertheless has the broad effect of largely precluding [the plaintiff] from pursuing her chosen career." 37 F.3d at 1529 (emphasis in original). The D.C. Circuit further established that such preclusion can be demonstrated where the government's action will "'seriously affect[], if not destroy[]' [her] ability to pursue [her] chosen profession." *O'Donnell*, 148 F.3d at 1141 (quoting *Kartseva*, 37 F.3d at 1529); *see also, e.g.*, *Taylor*, 56 F.3d at 1507; *Payne*, 773 F. Supp. 2d at 96; *Holman*, 436 F. Supp. 2d at 80.

The dispute is whether it was clearly established that a government official could be held liable when the reason for termination was not affirmatively disseminated to the public, but must inevitably be shared with future employers. Although the D.C. Circuit held as much in *McCormick*, that decision came after the events underlying this case. Nonetheless, *McCormick* built upon preexisting precedent within this Circuit making clear that a government employee's constitutional rights can be violated by an action that will broadly preclude her from future employment in her field, even if there is no formal publication.

The Supreme Court's decision in *Roth* emphasized that a stigma claim would arise from the government's *action* "in declining to re-employ the respondent," when that action "imposed . . . a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573. This contrasted with a reputation-plus claim, which would arise only from government *speech. See id.* Later, in *Bishop v. Wood*, the Supreme Court found that a reputation-plus claim could not stand where the statement "was not made public," but did not address the stigma theory. 426 U.S. 341, 348 (1976).

In a line of decisions, the D.C. Circuit established that the stigma theory does not require publication. In *Old Dominion Dairy Products v. Secretary of Defense*, it found a stigma claim where the government's determination that a contractor was

irresponsible and placement of "a written determination of
nonresponsibility" in the contractor's file would be revealed to
future contracting officers "every time Old Dominion bid for a
contract." 631 F.2d 953, 957, 963 (D.C. Cir. 1980). This
occurred because future contracting officers would inevitably
request information about the company's past performance and
thereby learn of the determination. *Id.* at 375–77, 381. This
finding was repeatedly confirmed when, faced with stigma claims,
the D.C. Circuit did not analyze whether there was sufficiently
broad publication, but instead analyzed whether the plaintiff
had alleged or proven sufficiently broad preclusion from her
field of employment. *See Orange*, 59 F.3d at 1274–75; *Kartseva*,
37 F.3d at 1529–30; *Taylor*, 56 F.3d at 1501, 1506–07; *Mosrie v.
Barry*, 718 F.2d 1151, 1156 (D.C. Cir. 1983).

Any doubt about the viability of a stigma claim in the absence
of publication was resolved in *O'Donnell v. Barry*, where the
D.C. Circuit denied a plaintiff's reputation-plus claim in part
for insufficient publication. *See* 148 F.3d at 1140. The Court
did not rely on this rationale to dispose of the plaintiff's
stigma claim; instead, it found that because the plaintiff had
found a new job as a Chief of Police in a small town, he could
not prove any foreclosure from employment. *Id.* at 1141. In so
holding, the D.C. Circuit noted that a stigma claim "differs
from [a reputation-plus claim] in that it does not depend on

official speech, but on a continuing stigma or disability arising from official action." *Id.* at 1140.

A 2011 decision by another Judge of this Court reaffirmed that a plaintiff may state a claim under the stigma theory without publication by the government. *See Okpala v. District of Columbia*, 819 F. Supp. 2d 13 (D.D.C. 2011). The Court held that:

> [D.C. Circuit precedent does not] stand[] for the proposition that a liberty interest claim based on defamation is actionable solely when outside publication occurs when proceeding under the 'stigma or disability' theory of liability. Indeed, valid liberty interest due process claims under the 'stigma or disability' theory were stated in [prior D.C. Circuit decisions] despite the fact that the defamatory statements were not published outside of government.

*Id.* at 17 (citations omitted). Although the D.C. Circuit in 2012 had not yet decided a case involving the precise facts at issue in this case, the line of precedent making clear in a variety of contexts that stigma claims do not require publication "preclude[s] a viable 'head-in-the-sand' defense." *Cox v. Roskelley*, 359 F.3d 1105, 1113 (9th Cir. 2004).

Having found that the particular constitutional right was clearly established, the Court must also determine whether Ms. Haines-Walton should have been aware that her conduct violated that right. *See Elkins*, 690 F.3d at 568. To avoid such a finding, she relies on *Holman v. Williams*, which found qualified immunity under a stigma theory where "[t]he official action in

question—plaintiff's termination—was itself not unlawful" and "the 'disability' to plaintiff (his inability to find other legal work) did not arise until after plaintiff had been fired." 436 F. Supp. 2d at 82. Ms. Haines-Walton relies on this reasoning to seek qualified immunity, Mot. at 17–18, but ignores the footnote that was attached to the quoted sentence, which states that "[p]laintiff makes no allegation that the Mayor or any other responsible official could have foreseen the effect of plaintiff's termination and the [public] statements . . . on plaintiff's subsequent employment prospects" and notes that the Court did not "find it reasonable to infer such foreseeability from the facts alleged." *Holman*, 436 F. Supp. 2d at 82 n.11.

*Holman* therefore stands for the proposition that an official is entitled to qualified immunity when it would not have been foreseeable that terminating someone could have a broadly preclusive effect in the future. This flows from the general purpose of qualified immunity: To ensure that government officials are held liable only when they "violate clearly established . . . rights *of which a reasonable person would have known*." *Pearson*, 555 U.S. at 231 (emphasis added). By contrast, when such preclusion is foreseeable, refusing to hold a government official liable would appear to preclude anyone from bringing a stigma-theory claim against an individual defendant.

In *Holman*, it was not foreseeable that statements which "denigrated the plaintiff's professional competence and impugned his personal reputation" and a published article indicating that the plaintiff had been fired for reasons related to "job performance" could have broadly precluded the plaintiff from employment in his field. *Id.* 79–82. By contrast, accepting Ms. McGinnis's allegations as true, it would have been foreseeable to Ms. Haines-Walton that termination for lying about a medical condition would broadly preclude a police officer from obtaining employment. Plaintiff notes that in *Tygrett v. Barry*, the Circuit cited approvingly a statement of a Judge of this Court that a "good reputation for truthfulness is essential to the ability of a police officer to perform efficiently and effectively his many testimonial duties." 627 F.2d 1279, 1285 (D.C. Cir. 1980). That Ms. Haines-Walton, as Director of Human Resources for the MPD, would have been aware of the importance of truthfulness and of plaintiff's likely need to share the reasons for her termination with prospective employers is not implausible. It thus could have been foreseeable, on the facts alleged, that Ms. Haines-Walton's actions could broadly preclude Ms. McGinnis from employment in law enforcement. Accordingly, plaintiff's claim against Defendant Haines-Walton may proceed.

>    b.    <u>Rosenthal, Petty, and Stroud</u>

According to Ms. McGinnis's allegations, Lieutenant Rosenthal, Inspector Petty, and Director Stroud participated in the "conspiracy" to terminate her for defamatory reasons and "encouraged the District to terminate [her] based on [the] defamatory pretext." First Am. Compl., ECF No. 10 ¶¶ 11, 93. Moreover, Ms. McGinnis alleged additional facts connecting each of them to events surrounding the termination. *See id.* ¶¶ 49–50, 57, 60–64, 70–72. As discussed above, participation in the decision to terminate Ms. McGinnis for allegedly defamatory reasons is sufficient to show that defendants Rosenthal, Petty, and Stroud caused the constitutional harm under the stigma theory by "the official's own individual actions." *Iqbal*, 556 U.S. at 676. Because defendants Rosenthal, Petty, and Stroud did not raise qualified immunity, the Court does not address whether they may be entitled to it at this stage of proceedings.

### B.    Ms. McGinnis's Reputation-Plus Theory Against the Individual Defendants.

The stigma and reputation-plus theories appear to be two sides of the same coin; Ms. McGinnis need only state a claim under one theory for her Fifth Amendment claim to go forward. *See Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 172 (D.D.C. 2012) (noting, where a plaintiff "appear[ed] to conflate" the reputation-plus and stigma theories, that "[t]o succeed on the merits of his claim, he will need to prove one or

the other"); *Okpala*, 819 F. Supp. 2d at 16 ("[w]hen pursuing [a Fifth Amendment claim], Plaintiff may proceed under one of two theories"). Although the Court has already found that Ms. McGinnis's claims against the individual defendants may proceed under the stigma theory, to ensure completeness, the Court also addresses whether her claims may proceed under the reputation-plus theory.

　　1.　　*Ms. McGinnis Alleged a Violation of Her Fifth Amendment Right Under the Reputation-Plus Theory.*

The reputation-plus theory addresses the harm that arises from government defamation in conjunction with a "change in legal status." *Mosrie*, 718 F.2d at 1161. "This theory makes the termination actionable only where the terminating employer has disseminated the reasons for the termination and such dissemination is defamatory." *McCormick*, 752 F.3d at 988. The reasons, moreover, must not "pertain[] solely to plaintiff's job performance" because "dismissal for 'unsatisfactory job performance . . . does not carry with it the sort of opprobrium sufficient to constitute a deprivation of liberty.'" *Holman*, 436 F. Supp. 2d at 79 (quoting *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987)).

It is undisputed that plaintiff's termination "is an example of a 'paradigmatic' status change" for purposes of a reputation-plus claim. *See Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir.

1989). It is also well-established that "accusations of dishonesty" may create reputation-damaging harm "of Constitutional proportions." *Alexis*, 44 F. Supp. 2d at 339. The parties dispute whether the reasons for Ms. McGinnis's termination were disseminated. Plaintiff claims that they were, in two ways: (1) through the placement of the Haines-Walton Memo in her personnel file, "which is potentially available to prospective employers or other government officials"; and (2) through publication to MPD officers, including Sergeants Butler and Young, who were allowed to read her personnel file, and "[o]thers in the MPD and at the Academy[, who] have become aware of the defamatory rationale for [her] termination despite their having no legitimate business-related reason to know." First Am. Compl., ECF No. 10 ¶¶ 80, 102-03. Defendants respond that the memo cannot be made available to anyone pursuant to D.C. law, and that any dissemination to members of the MPD is not publication for purposes of a reputation-plus claim. *See* Reply at 8-12.

Plaintiff's first theory—that the placement of the Haines-Walton Memo in her personnel file is sufficient publication because the file may be available to prospective employers— implicates a long-running split among the Circuits.[3] The D.C.

---

[3] *Compare Burton v. Town of Littleton*, 426 F.3d 9, 15 n.5, 17 (1st Cir. 2005) (requiring proof that reputation-damaging

Circuit previously took a side, indicating that placement of a

defamatory statement in a personnel file that may be available

to elements of the public was enough for a reputation-plus

claim. *See Mazaleski v. Treusdell*, 562 F.2d 701, 713 (D.C. Cir.

1977) (publication was properly alleged where statement was

placed in a personnel file, in light of a rule permitting

"limited information [from a personnel file] to be provided

prospective employers upon inquiry"). Subsequently, in *Doe v.*

*Department of Justice*, the Circuit found that "[t]he 'public

disclosure' requirement would also be satisfied if the [agency]

placed [a] termination memorandum in [a plaintiff's] personnel

file and made that file available, even on a limited basis, to

prospective employers or government officials." 753 F.2d 1092,

1113 n.24 (D.C. Cir. 1985); *see also Brandt*, 820 F.2d at 45

(citing *Doe* as an example of a court "conclud[ing] that the

public disclosure requirement has been satisfied where the

stigmatizing charges are placed in the discharged employee's

---

statement in personnel file has already been disseminated to the
public), *Kocher v. Larksville Borough*, 548 F. App'x 813, 820–21
(3d Cir. 2013) (same), *Johnson v. Martin*, 943 F.2d 15, 16–17
(7th Cir. 1991) (same), *and Pollock v. Baxter Manor Nursing*
*Home*, 706 F.2d 236, 241–42 (8th Cir. 1983) (same), *with Cox v.*
*Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004) (requiring only
that the personnel file could be viewed by the public), *Bailey*
*v. Kirk*, 777 F.2d 567, 580 n.18 (10th Cir. 1985) (same), *Buxton*
*v. City of Plant City*, 871 F.2d 1037, 1045–46 (11th Cir. 1989)
(same), *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44–45
(2d Cir. 1987) (requiring a likelihood that file will be viewed
by the public), *and Sciolino v. City of Newport News*, 480 F.3d
642, 649 (4th Cir. 2007) (same).

personnel file and are likely to be disclosed to prospective employers"). In reliance on these decisions, one Judge of this Court recently found that an "allegation that there is negative information injuring [a plaintiff's] reputation in his file that is publicly available to future employers states a reputation-plus claim [when that information] consists of the reasons for his termination." *Peter B v. CIA*, 620 F. Supp. 2d 58, 72 (D.D.C. 2009).

Two other Judges of this Court, however, have concluded that this understanding has been undermined by subsequent developments. *See Dave*, 926 F. Supp. 2d at 250–51; *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 110 (D.D.C. 2012). Those decisions note that the D.C. Circuit has emphasized the need for allegations or proof "that the government has disseminated the cause of his termination." *U.S. Information Agency v. Krc*, 905 F.2d 389, 398 (D.C. Cir. 1990); *see also Doe v. Cheney*, 885 F.2d at 910 (claim failed because the agency "did not disseminate publicly any of the information"). Indeed, the D.C. Circuit has held that "injury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements." *Orange*, 59 F.3d at 1274. None of these D.C. Circuit decisions, however, involved the placement of reputation-damaging information in a publicly available personnel file.

The Court therefore follows the decision in *Peter B* and the
D.C. Circuit's decisions in *Doe* and *Mazaleski*, which appear to
be the only D.C. Circuit decisions to have addressed whether a
statement is published when it is placed in a public personnel
file. The Circuit's more general description of the publication
requirement did not clearly displace those earlier decisions and
it appears that the government's act of placing a statement in a
publicly available personnel file would be "publication" within
the meaning of those decisions. *See Krc*, 905 F.2d at 398 (a
plaintiff must allege "that the government has disseminated the
cause of his termination"). Accordingly, if Ms. McGinnis's
personnel file is available to future employers, she has stated
a reputation-plus claim.

Defendants contend that the file cannot be made available to
anyone, so there is no possible risk of future publication. They
initially relied upon a declaration from Ms. Haines-Walton, but
such evidence is unhelpful to the resolution of a motion to
dismiss. *See* Mot. at 7–8 (citing Haines-Walton Decl., ECF No.
13-1 ¶¶ 6–7). Defendants shifted gears in their reply brief,
when they cited a District of Columbia regulation. *See* Reply at
10–12. The Court is skeptical of defendants' request that it
consider this argument, which was not mentioned until their
reply brief. Indeed, the D.C. Circuit has noted that "district
courts, like this court, generally deem arguments made only in

reply briefs to be forfeited." *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010) (quotation marks omitted). Moreover, the cited regulations appear to provide contradictory guidance. They prohibit disclosure to a "prospective employer" of "[t]he reason for [an employee's] separation . . . without the prior written consent of the data subject." D.C. Mun. Regs. Tit. vi § 3113.3 (2014). The regulations subsequently state that "[i]nformation from the Official Personnel Folder may be disclosed to a prospective District or Federal Government employer." *Id.* § 3113.7.

These related concerns, that defendants did not mention these regulations until their reply brief and failed to explain the potentially contradictory nature of the regulations, prevent the Court from holding at this stage of proceedings that Ms. McGinnis's personnel file is not available to any member of the public. *See Mazaleski*, 562 F.2d at 713 ("In view of this apparent inconsistency [between a regulation keeping personnel files secret and another permitting disclosure to prospective employers] and the lack of any further explanation by the parties, we cannot now conclude that the reasons for [the plaintiff's] termination will remain confidential.)". The Court must therefore accept Ms. McGinnis's allegation that the file is public. *See* First Am. Compl., ECF No. 10 ¶ 103. Accordingly, Ms. McGinnis has stated a Fifth Amendment claim under the

reputation-plus theory on the basis of the presence of the memo in her personnel file, which is allegedly available to prospective employers.[4]

> 2. *Ms. Haines-Walton is Entitled to Qualified Immunity and the Other Individual Defendants Did Not Participate in the Constitutional Violation.*

Having established that Ms. McGinnis sufficiently alleged a violation of her Fifth Amendment right under the reputation-plus theory, Ms. McGinnis must show "'that each [individual defendant], through the official's own individual actions, has violated the Constitution.'" *Elkins*, 690 F.3d at 564 (quoting *Iqbal*, 556 U.S. at 676). Moreover, individual defendants may be entitled to qualified immunity, "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Butera*, 235 F.3d at 646 (quoting *Harlow*, 457 U.S. at 818).

Ms. Haines-Walton contends that, even if plaintiff has alleged her participation in the violation of a Fifth Amendment right,

---

[4] Because Ms. McGinnis has stated a reputation-plus theory on this basis, the Court declines to address her alternative argument that she has also stated a reputation-plus theory due to the fact that "[o]thers in the MPD and at the Academy have become aware of the defamatory rationale for [her] termination despite their having no legitimate business-related reason to know." First Am. Compl., ECF No. 10 ¶ 102. Addressing this alternate dispute at this stage of proceedings would not affect her claims against any individual defendant because she pled no facts to connect any of the individual defendants' "own individual actions," *Iqbal*, 556 U.S. at 676, to any dissemination of the memo to any MPD or Academy official.

she is entitled to qualified immunity. Defendants Rosenthal, Petty, and Stroud did not raise qualified immunity in their motion to dismiss, arguing only that Ms. McGinnis failed to allege facts to support an inference that they caused any constitutional violation.

Ms. McGinnis has failed to connect defendants Rosenthal, Petty, and Stroud to the reputation-plus violation through the placement of the Haines-Walton Memo in her personnel file. None of those defendants are alleged to have written the memo, placed it in her file, or made it available to anyone. Ms. McGinnis has, however, alleged sufficient facts to connect Ms. Haines-Walton to that action by claiming that Ms. Haines-Walton wrote the memo. The Court must therefore address whether Ms. Haines-Walton is entitled to qualified immunity for that action.

In the wake of *Roth* and its follow-on cases, it is "clearly established that when the government terminates a public employee and makes false or substantially inaccurate public charges or statements that stigmatize the employee, that employee's liberty interest is implicated." *McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir. 1992); *see also Mosrie*, 718 F.2d at 1161. At the time of the actions at issue in this lawsuit, it was clearly established that termination was "a 'paradigmatic' status change" triggering this right, *Doe v. Cheney*, 885 F.2d at 910, and that "accusations of dishonesty"

could cause reputation-damaging harm "of Constitutional proportions." *Alexis*, 44 F. Supp. 2d at 339; *see also Harrison*, 815 F.2d at 1518. The question is whether it was clearly established that Ms. Haines-Walton could publicize those charges by writing them in a memo that was placed in Ms. McGinnis's personnel file.

The precedent within this Circuit on this precise question is conflicted. Two D.C. Circuit decisions seem to establish that placement of reputation-damaging statements in a personnel file that could be viewed by the public is sufficient publication. *See Doe*, 753 F.2d at 1113 n.24; *Mazaleski*, 562 F.2d at 713. This precedent is arguably undermined by subsequent D.C. Circuit decisions, which state that "injury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements." *Orange*, 59 F.3d at 1274. In reliance on similar D.C. Circuit decisions, two Judges of this Court concluded that a plaintiff cannot state a reputation-plus claim merely by alleging that the reasons for her termination are publicly available in a personnel file. *See Dave*, 926 F. Supp. 2d at 250–51; *De Sousa*, 840 F. Supp. 2d at 110. Although the Court holds that a reputation-plus claim may be stated in this manner, the fact that district judges have come to differing conclusions means that it cannot be said that "existing precedent . . . ha[s] placed the . . . constitutional question beyond debate."

*Reichle*, 132 S. Ct. at 2093 (quotation marks omitted). Accordingly, under the reputation-plus theory, Ms. Haines-Walton is entitled to qualified immunity with respect to the placement of the Haines-Walton Memo in Ms. McGinnis's personnel file.

### C. Ms. McGinnis's Claim Against the District

Ms. McGinnis's claim against the District relies on the same theories as her claims against the individual defendants. The Court has already held that Ms. McGinnis stated a claim under both the stigma and reputation-plus theories. *See supra* Parts III.A–B. In order for the District to be liable for those violations, it "must have acted in accordance with a government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Yancey v. District of Columbia*, 991 F. Supp. 2d 171, 179 (D.D.C. 2013) (quotation marks omitted). The policy, moreover, must have been "the moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quotation marks and alterations omitted).

Plaintiff alleges the existence of two policies, each of which she claims was a moving force behind the constitutional violation. *See* First Am. Compl., ECF No. 10 ¶¶ 112–26. First, she asserts that the OC spray training at the MPD Academy was done incorrectly—recruits were sprayed directly in the eyes— pursuant to a District policy or custom ("the OC Spray Policy").

41

*See id.* ¶¶ 112–20. Second, Ms. McGinnis alleges that the MPD has a policy of not providing notice and a hearing to individuals fired for reputation-damaging or stigmatizing reasons ("the Hearing Policy"). *See id.* ¶¶ 121–26.

The District argues that it cannot be held liable because plaintiff has not alleged a sufficient causal connection between the OC Spray Policy and any constitutional violation. *See* Mot. at 18–20. Nowhere in its motion did the District address plaintiff's allegations regarding the Hearing Policy and its causal connection to the constitutional violation. Moreover, even though the plaintiff discussed the Hearing Policy in her opposition brief, Opp. at 17–18, the District did not respond in its reply brief. Because the District failed to address these allegations in its motion "and fails to respond to Plaintiff's point in its Reply, the Court will deem it abandoned at least for now." *Ashraf-Hassan v. Embassy of France*, 878 F. Supp. 2d 164, 173–74 (D.D.C. 2012); *see also Lewis v. United States*, No. 90-991, 1990 WL 179930, at *2 (D.D.C. Oct. 29, 1990); *cf. Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992) (noting that courts decline to consider arguments newly raised in a reply brief "given our dependence as an Article III court on the adversarial process for sharpening the issues for decision"). Accordingly, for the purposes of this motion, the Court assumes that plaintiff has adequately alleged the

existence of the Hearing Policy and its connection to the constitutional violation. This is sufficient to state a claim against the District.

## IV. Conclusion

For the foregoing reasons, the Court hereby **DENIES** defendants' motion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
          **United States District Judge**
          **August 28, 2014**